# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| ROBERT WASHINGTON, | : | No. 3:07cv1159 |
| Plaintiff | : | |
| v. | : | (Judge Munley) |
| | : | |
| MARY LOU SHOWALTER, | : | |
| Defendant | : | |

## MEMORANDUM

Before the court is Defendant Mary Lou Showalter's motion for summary judgment (Doc. 37) pursuant to Rule 56 of the Federal Rules of Civil Procedure. Having been briefed, the matter is ripe for disposition.

## BACKGROUND

Plaintiff Robert Washington ("Washington") brings this action under 42 U.S.C. § 1983 claiming reckless indifference to his serious medical needs by Defendant Mary Lou Showalter, R.N. ("Showalter"). At all relevant times, Washington was an inmate at the State Correctional Institution at Huntingdon, Pennsylvania ("SCI-Huntingdon"). Defendant Showalter is the Correctional Health Care Administrator at SCI-Huntingdon and is responsible for managing the health care services program at the prison. (Showalter Decl. at ¶¶ 1, 3 (Doc. 43); Def. Statement of Undisputed Material Facts ("SUMF") at ¶ 1 (Doc. 48)).

Plaintiff's complaint asserts that as a result of being placed in solitary confinement at the prison, he suffers from hallucinations which tell him to hurt himself and others. (Compl. at ¶ 4 (Doc. 1)). He has tried to commit suicide several times and suffers from suicidal ideation. (Id. at ¶ 5). He further avers that the prison continually places him in circumstances that lead to him to attempt to commit suicide. (Compl. at ¶ 6). Plaintiff claims that the defendants are purposely failing to provide him with proper mental health medical assistance, thus depriving him of the rights guaranteed by the Constitution and the laws of the United States. (Id. at ¶ 7). He also

states that the defendants prevent him from receiving proper mental health treatment by failing to recommend him to a more appropriate facility with mental health treatment. (Id. at ¶ 8).

Washington's medical record establishes that he was transferred from SCI-Houtzdale to SCI-Huntingdon on August 8, 2006. (Medical Report ("MR") at 16, 210 (Docs. 44, 45)).[1] Washington was seen on August 11, 2006 by a psychiatrist, Dr. Altman, for complaints of hallucinations. (MR at 16, 210). The psychiatrist prescribed psychotropic medication and directed Washington to return to the clinic in thirty days for a follow-up evaluation. (MR at 16, 210). On August 17, 2006, an individual treatment plan was developed for Washington, which provided for weekly counseling sessions and monthly psychiatry reviews. (MR at 96).

The prison's nursing staff noted on September 8, 2006 that Washington had refused two doses of Sinequan, which is one of the psychotropic medications prescribed to treat Washington's mental health conditions. (MR at 158). Washington continued to refuse his prescribed psychotropic medication, Sinequan from September 10 to 21, 2009, missing a total of fifteen doses. (MR at 149 to 157). Because of this non-compliance, Washington's treating psychiatrist discontinued Washington's prescription of Sinequan on September 27, 2006. (MR at 16, 210).

On October 10, 2006, Washington missed an appointment with his treating psychiatrist, because he was placed in the restricted housing unit ("RHU") for misconduct. (MR at 210). At the treating psychiatrist's direction, the institution nursing staff rescheduled the appointment. (Id.)

---

[1] Washington's medical record is found in four volumes. (Docs. 44 to 47). The court will cite to the medical record page numbers throughout this opinion.

2

Washington was evaluated by a nurse upon entering the RHU that day. (MR at 80). On October 26, 2006, Washington was seen by a psychiatrist and issued another prescription for Sinequan. (MR at 210). He was directed to return to the clinic in thirty days for follow-up. (Id.)

On November 9, 2006, a psychological services specialist saw Washington and noted that Washington was rational and that Washington denied having any thoughts of self-harm. (MR at 59). Another psychological services specialist evaluated Washington on November 13, 2006. (MR at 57). Washington reported stress from his confinement in the RHU but denied thinking suicidal thoughts. (Id.) The specialist counseled Washington on how to manage anxiety and discussed seeing a psychiatrist for medication to help with difficulty sleeping. (Id.) Washington was seen by a psychological services specialist again the next day, November 14, 2006, after a concerned call from Washington's mother. (MR at 58). Washington reported that he was stressed, but denied suicidal thoughts. (Id.)

Two weeks later, on November 29, 2006, Washington's cell-mate submitted a request slip stating that Washington had attempted to hang himself. (MR at 56). Washington told a psychological services specialist that he was experiencing auditory hallucinations, felt depressed and that Sinequan was not working for him. (Id.) Shortly after meeting with the psychological services specialist, psychiatrist Dr. Polmueller ordered that Washington be closely observed every fifteen minutes and that suicide precautionary measures be taken. (MR at 207). Washington remained under close observation from November 29, 2006 until December 6, 2006. (MR at 204 to 207, 240 to 250).

Later on November 29, 2006, another psychiatrist, Dr. Kirk, diagnosed Washington with major depression and prescribed Hydroxyzine,

3

Thorazine, and Cogentin. (MR at 15, 20, 205). Dr. Kirk revisited Washington on November 30, 2006, but Washington would not speak to him. (MR at 21, 205). Washington's psychotropic medication was continued, but Washington refused a total of ten doses over November 29 and 30. (MR at 21, 146, 205).

Dr. Kirk saw Washington again on December 1, 2006. (MR at 21, 205). Washington stated that he was still suicidal but had improved over the last two days. (MR at 21, 205). Washington reported that he was suffering no adverse effects from the psychotropic medication that Dr. Kirk prescribed. (MR at 21). Dr. Kirk continued Washington's medications and directed that Washington remain under constant observation. (MR at 21, 205). Later that day, nursing staff noted that Washington had again refused his prescribed doses of Hydroxyzine, Thorazine, and Cogentin. (MR at 147).

On December 4, 2006 Washington was examined by Dr. Kirk who adjusted the dosages of Washington's Thorazine and Cogentin and prescribed Sinequan. (MR at 14, 204, 240). Washington was continued on constant observation. (MR at 14, 204, 240). Dr. Kirk examined Washington again on December 5, 2006. (MR at 204). Later in the day Dr. Kirk recommended releasing Washington from close observation. (Id.)

A psychological services specialist saw Washington on December 6, 2006. (MR at 55). At that time, Washington denied that he had intended to harm himself on November 29, 2006. (Id.) Washington was released from observation to the RHU later that day. (MR at 204, 238).

The Psychiatric Review Team ("PRT")– consisting of Dr. Kirk and several other specialists and prison administrators– met on December 7, 2006 to review Washington's psychiatric needs. (MR at 95, 238). The PRT released Washington to a less-vigilant period of observation in the

4

RHU. (MR at 95, 238). Dr. Kirk saw Washington again on December 8, 2006 and adjusted Washington's Thorazine and Cogentin dosages. (MR at 203, 279). Dr. Kirk directed Washington to return to the clinic in thirty days for a follow-up evaluation. (MR at 203, 279).

Approximately three weeks later, on December 28, 2006 a nurse reported that Washington swallowed a handful of pills. (MR at 236, 239). Prison staff immediately treated Washington with activated charcoal. (MR at 203, 239, 279). Washington vomited, but no pill fragments were visible. (MR 203, 239, 279). A psychiatrist was immediately called. (MR at 279). Dr. Polmueller saw Washington and directed that Washington be reviewed for a mental health commitment after he was medically cleared. (Id.) Washington was transferred to the nearby hospital, JC Blair, for treatment. (MR at 264 to 282). After his release from the hospital, Washington was transferred to SCI-Smithfield, where he was placed in a Psychiatric Observation Cell ("POC") on an involuntary mental health commitment. (MR at 130 to 142, 324 to 331).

The next day, on December 29, 2006, Washington was transferred to SCI-Rockview for continued mental health treatment in that institution's Mental Health Unit ("MHU") on an involuntary mental health commitment. (MR 321, 324, 347 to 349, 361 to 368, 374 to 400). On January 2, 2007 an application was filed to extend Washington's involuntary mental health treatment. (MR 320 to 323). The Centre County Court of Common Pleas granted the application on January 15, 2007. (MR at 332 to 335).

The psychology staff from SCI-Huntingdon had a teleconference on January 17, 2007 with the MHU staff at SCI-Rockview regarding Washington's condition. (MR at 52, 53, 54). The SCI-Rockview staff reported that it was their opinion that Washington was using his mental health complaints to manipulate SCI-Huntingdon staff to obtain a transfer

5

from Huntingdon. (MR at 52, 53, 54). SCI-Rockview staff reported that Washington showed no signs or symptoms of psychosis or depression. (MR at 52, 53, 54). The SCI-Rockview staff diagnosed Washington with an adjustment disorder and recommended Prozac for treatment. (MR at 52, 53, 54).

Washington was transferred back to SCI-Huntingdon on January 18, 2007. (MR at 236). Washington was housed in the medical department for observation and was seen by a psychological services specialist. (MR at 51). Washington initially stated that he wanted to hurt himself but later denied any suicidal thoughts. (Id.) The psychological services specialist recommended that Washington be reviewed by the PRT. (Id.) Later that day, Washington was examined by a nurse. (MR at 236). The nurse noted that Washington stated that he was suicidal but avoided discussing the issue. (Id.) Washington was released to the RHU later that day. (Id.) On January 22, 2007 Washington was evaluated by a psychological services specialist. (MR 48, 49, 237).

On February 2, 2007, a nurse distributed medication to Washington, who stated that he could not "take this anymore" and swallowed approximately ten pills. (MR at 237). The psychiatrist was paged and Washington was moved to an observation cell in the medical department. (Id.) Washington was given activated charcoal to neutralize the medication. (Id.) Upon the order of Dr. Salomon, a psychiatrist, Washington was transported to the emergency room at JC Blair Hospital. (MR at 234). Washington was discharged by JC Blair and returned to SCI-Huntingdon that same day. (MR at 234). Washington was placed in an observation cell in the medical department and was given Maalox, per the directions of the JC Blair attending physician. (Id.)

Between February 2 and February 5, 2007 Washington remained

6

under constant observation in the medical department. (MR at 230 to 235). On February 5, 2007 Washington was seen by a psychological services specialist regarding his attempted overdose. (MR at 47). Washington told the specialist that he wanted to be let out or transferred and admitted acting inappropriately. (Id.) The specialist determined that Washington was rational and coherent and recommended that he be released from close observation. (Id.) Several hours later, Washington was released from the observation cell and was moved to the RHU. (MR at 230).

The next day, February 6, 2007, nursing staff noted that Washington had refused his morning dose of Prozac six times. (MR at 230). Washington was referred to psychiatry and informed of the possible negative consequences of refusing his psychotropic medication. (Id.)

On February 15, 2007 the PRT reviewed Washington's case. (MR 230). On February 16, 2007, Washington fashioned a sheet to hang himself but did not put the noose around his neck. (MR at 231). Washington was escorted to the observation cell in the medical department. (Id.) Washington denied attempting to hurt himself. (Id.) The psychiatrist, Dr. Polmueller, was alerted and he directed that Washington be placed under close observation in the medical department. (MR at 193, 231). Washington was closely observed from February 16 to 20, 2007. (MR 224 to 231).

On February 20, 2007, Washington was seen by a psychological services specialist. (MR at 45). Washington told the specialist that the sheet had been a misunderstanding and that he had been doing his laundry. (Id.) That day, a psychiatrist, Dr. Mellon recommended releasing Washington from close observation and prescribed Sinequan. (MR at 192). Washington was returned to the RHU. (MR at 224). The PRT

reviewed Washington's case again on February 22, 2007. (MR at 93, 224). The PRT noted that Washington had been under close observation. (MR at 93). The PRT recommended that he be released from close observation but that psychiatry and psychology staff continue to follow him. (MR at 93).

Psychiatrist Dr. Suzanne Fried saw Washington for a pre-scheduled appointment in the RHU on March 15, 2007. (MR 12, 192). Dr. Fried noted that Washington showed no signs of psychosis. (MR at 12, 192). Dr. Fried prescribed Sinequan and directed that Washington follow-up in the clinic in thirty days. (MR at 12, 192). Another psychiatrist, Dr. Mellon, saw Washington on March 20, 2007 and indicated that there were no signs or symptoms of psychosis. (MR at 12).

On March 27, 2007 Washington filed an official inmate grievance complaining of inadequate medical treatment and requesting better medical facilities. (March 27, 2007 Grievance (Doc. 1 at 8 to 9)). On April 2, 2007 Showalter reviewed Washington's grievance. (Showalter Decl. at ¶¶ 5, 6). Upon reviewing Washington's medical record, Showalter denied his grievance, stating "[r]eview of your medical record indicates that you are being followed by the psychiatrist on a routine basis. You are receiving medications as prescribed. You have been sent to the Mental Health Unit as needed." (Id. at ¶¶ 7 to 9, 12). Washington appealed this decision on April 9, 2007, but was denied. (Doc. 1 at 11, 12). Washington made a final appeal on April 12, 2007, but was denied again. (Doc. 1 at 13, 14).

Washington's medical treatment continued after his grievance. On March 29, 2007 the PRT reviewed Washington's case. (MR at 92, 224). Dr. Kirk visited Washington in the RHU on May 25, 2007. (MR at 11). Washington stated that he was still hallucinating and that the staff at SCI-Houtzdale had the right combination of anti-psychotic medication. (Id.) A psychiatrist, Dr. Mattich, examined Washington on June 22, 2007 and

8

increased the dosage of Sinequan upon Washington's complaints of depression, anxiety, and auditory hallucinations. (MR at 45).

Plaintiff Washington filed suit on June 28, 2007. (Doc. 1). On January 28, 2008 Defendants Chief Grievance Officer Kristen Reisinger, Superintendent David J. Wakefield, Deputy Superintendent Michael Harlow, Deputy Superintendent Raymond Lawler, Classification Manager Brian Corbin, Showalter and Unit Manager Joseph Keller filed a motion to dismiss pursuant to Federal Rule of Procedure 12(b)(6). In an order dated September 18, 2008, this court dismissed all of plaintiff's claims brought against the defendants in their official capacity. (Doc. 24). Plaintiff's claims against Reisinger, Wakefield, Harlow, Lawler, Corbin and Keller were dismissed for failure to allege personal involvement. (Id.) Defendant Showalter, the remaining defendant, filed a motion for summary judgment on plaintiff's deliberate indifference claim, bringing the case to its present posture. (Doc. 37).

**JURISDICTION**

As this complaint was filed under 42 U.S.C. § 1983, the court has jurisdiction pursuant to 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").

**LEGAL STANDARD**

The granting of summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Knabe v. Boury, 114 F.3d 407, 410 n.4 (3d Cir. 1997) (citing FED. R. CIV. P. 56(c)). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an

otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

When considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion. Int'l Raw Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir. 1990). The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material if it might affect the outcome of the suit under the governing law. Id. Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. Celotex v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies its burden, the burden shifts to the non-moving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. Id. at 324.

**DISCUSSION**

A prison official's deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment because the government has an "obligation to provide medical care for those whom it is punishing by incarceration." Estelle v. Gamble, 429 U.S. 97, 103 (1976). A prisoner plaintiff "must show (I) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." Natale v. Camden County Corr. Facility, 318 F.3d 575, 582 (3d Cir. 2003) (citing Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999)). There is no question

that Washington's hallucinations and suicide attempts constitute a serious medical need and defendant does not argue otherwise. Therefore, we must only determine whether defendant's actions indicate deliberate indifference to plaintiff's psychological problems.

In analyzing deliberate indifference, a court must determine whether the prison official "acted or failed to act despite his knowledge of a substantial risk of serious harm." Farmer v. Brennan, 511 U.S. 825, 841 (1994). A prisoner plaintiff must prove that the prison official "knows of and disregards an excessive risk to inmate health or safety." Id. at 837. A mere complaint that medical staff have "been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment [as] medical mistreatment does not become a constitutional violation merely because the victim is a prisoner." Estelle, 429 U.S. at 106. See also Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993) (inadequate medical treatment resulting from negligence is not a constitutional violation).

Finally, a non-physician defendant cannot be considered deliberately indifferent for failing to respond to an inmate's medical complaints when he is already receiving treatment by the prison's medical staff. Durmer, 991 F.2d at 69. The Court of Appeals for the Third Circuit explained that a prison's need for efficient division of labor suggests that where a prisoner is being treated by medical personnel "a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004).

The issue before the court is whether Showalter knew of Washington's psychological problems and disregarded the risk they presented to his health and safety by denying his grievance after reviewing his medical record. The parties do not dispute whether Showalter knew of

a substantial risk of serious harm to Washington. (See SUMF at ¶¶ 54, 55). Washington's grievance of March 27, 2007 explained that he was hallucinating, had a history of suicidal ideation, and was not receiving adequate treatment. By reviewing and denying this grievance, Showalter knew that Washington risked serious harm if not treated. The only question, therefore, is whether Showalter was justified in concluding that Washington was receiving adequate medical care from the prison's medical staff.

After reviewing the record evidence in a light most favorable to Washington, as both the non-moving party and a *pro se* plaintiff, we conclude that there is no genuine issue of material fact as to whether Showalter was justified in believing that Washington was receiving adequate care from the prison's medical staff. See Estelle, 429 U.S. at 106 (a *pro se* pleading is held to less stringent standards than more formal pleadings drafted by lawyers). The general import of Washington's complaints to the prison's medical staff was that he preferred to receive another medication and be placed in another facility. For summary judgment purposes, we assume that Washington is correct– that another medication would better treat his hallucinations and that he could have been transferred to a better-equipped facility. Neither of these facts is sufficient, however, to establish a claim for deliberate indifference because Showalter, as a non-medical prison official, was entitled to presume the adequacy of Washington's treatment by prison medical staff.

No facts on the record suggest that Showalter's reliance on the prison medical staff's treatment of Washington was not justified. Washington's medical record is replete with visits and consultations with psychiatrists, nurses, psychological services specialists, and emergency room doctors throughout the relevant time period. The medical record, as

summarized above, shows that the prison staff responded quickly and thoroughly to each of Washington's health emergencies and made repeated efforts to cooperate with Washington to treat his underlying mental health problems. Washington's difference of medical opinion fails to establish deliberate indifference. Absent a showing that the medical report is inaccurate and that the described course of treatment did not occur, plaintiff's claim fails. Therefore, Plaintiff Washington has not established a genuine issue of material fact as to whether Defendant Showalter was deliberately indifferent to his serious medical needs. Summary judgment will be granted in favor of Defendant Showalter.

**CONCLUSION**

Because Plaintiff Washington has not established a genuine issue of material fact as to whether Defendant Showalter was deliberately indifferent to his serious medical needs summary judgment in favor of Showalter is appropriate. Plaintiff's claim will be dismissed in an order that follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ROBERT WASHINGTON, : No. 3:07cv1159
    Plaintiff :
  v. : (Judge Munley)
     :
MARY LOU SHOWALTER, :
    Defendant :
::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## ORDER

**AND NOW**, to wit, this 31st day of December, upon consideration of Defendant Showalter's motion for summary judgment (Doc. 37), it is HEREBY ORDERED that the motion is **GRANTED**. The Clerk of Court is directed to close this case.

                                  **BY THE COURT:**

                                  **s/ James M. Munley**

                                  **JUDGE JAMES M. MUNLEY**
                                  **United States District Court**